## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GUY DONNELLY SHANNON, JR, 201-038    *

        Plaintiff           *

   v.                         *          Civil Action No. ELH-11-1830

                               *

DEPARTMENT OF PUBLIC SAFETY
and CORRECTIONAL SERVICES, et al.    *

        Defendants       *

                             ***

## MEMORANDUM

The self-represented plaintiff, Guy Donnelly Shannon, Jr., a State of Maryland inmate now confined at Patuxent Institution, filed a prisoner civil rights suit against numerous defendants.   The Department of Safety and Correctional Services ("DPSCS"); John Wolfe; Rene Greene; Martin Ice; Shalawnda Suggs; Iwill Mason; and Christopher Ogbolu, defendants (collectively, the "State Defendants"), moved to dismiss or, in the alternative, for summary judgment. ECF 12. Defendants Corizon, Inc. ("Corizon"), formerly known as Correctional Medical Services, Inc. or "CMS"; Andrew Moultrie, M.D.; and John Moss, PAC (collectively, the "Medical Defendants"),[1] have also moved to dismiss or, in the alternative, for summary judgment.  ECF 21.  Plaintiff has filed a response (ECF 23) as well as a "Motion in form of a settlement out of court on all cases" (ECF 24).

---

[1] Plaintiff also named "Nurse Chrissy" as a defendant.  However, she was never served. Because Shannon raises no claims against Chrissy, she shall be dismissed as a defendant in this case.

The issues have been fully briefed, and the Court now rules pursuant to Local Rule 105.6, no hearing being necessary.  After considering the pleadings, exhibits, and applicable law, the Court will grant the dispositive motions filed by the State Defendants (ECF 12) and the Medical Defendants (ECF 21).  A separate Order follows.

## I.   PETITIONER'S CLAIMS

Shannon filed suit on June 30, 2011, while he was incarcerated at Jessup Correctional Institution ("JCI").  He alleged that, since May 4, 2011, he was refused medical treatment by the defendants, despite his "many Sick Call Requests and ARP[s]."  (ECF 1, Complaint, p. 1).  Shannon claims that he suffers from seizures, asthma, degenerative joint disease in his hips, back, knees, and shoulders, and chronic arthritis in his neck, ECF 1 at 1, and John Moss ("P.A. Moss"), a physician's assistant, prevented him from seeing any doctors for his conditions.  *See* ECF 3, Supplement to Complaint, p. 3.  Further, Shannon alleges that, on June 14, 2011, P.A. Moss told him that he would be seen by Dr. Moultrie on June 15, 2011, yet he did not see Dr. Moultrie.  ECF 1 at 1.  From June 22, 2011 to June 27, 2011, Shannon staged a hunger strike but he was not seen by a medical provider afterwards.  *Id*. at 1.  He also claims that, on June 24, 2011 and June 27, 2011, Nurse Chrissy asked officers on the B unit tier to take Shannon to the medical tier, but he was never sent.

According to Shannon, he is in pain, and he "can't sleep or eat all the time," causing mental health problems.  Moreover, he contends that his treatment amounts to cruel and unusual punishment, in violation of the Eighth Amendment.  As redress, he asks the Court to issue an order to prescribe Tylenol-3, an MRI or CT-scan, a vaporizer, and a fan.  ECF 1 at 2; ECF 3 at 5.

## II.    FACTUAL SUMMARY

Defendants have filed verified and undisputed copies of Shannon's medical records, along with the Affidavit of Andrew Moultrie, M.D., dated November 22, 2011.  ECF 21-2.  Since December 2009, Moultrie served as the Medical Director for Corizon at JCI, where Shannon was incarcerated.

Shannon has a history of a seizure disorder, asthma, and chronic pain in his cervical spine and hips.  ECF 21-2, Medical Defendants' Exhibit A, Affidavit of Andrew Moultrie, M.D. (hereinafter, "Exhibit A"), ¶ 3; Exhibit B, Shannon's Medical Records (hereinafter, "Exhibit B"), pp. 1-2, 8, 37-39.  An x-ray of plaintiff's knees and hips, taken on July 23, 2010, showed no acute disease or abnormalities, however.  When Shannon was transferred to JCI from the Western Correctional Institution ("WCI") on or about May 4, 2011, he was prescribed Dilantin for the seizure disorder, an albuterol inhaler for asthma, Neurontin for chronic pain, and amitriptyline for a depressive disorder. Exhibit A, ¶ 3.

Plaintiff submitted Sick Call Request Forms dated May 6, May 7, May 10, May 16, and May 19, 2011,[2] "complaining of pain" and "requesting a high-calorie kosher diet, an asthma 'pump,' and a fan for his cell."  Exhibit A, ¶ 4; *see also* Exhibit B, pp. 1-5, 8, and 11.  On May 12, 2011, Gwendolyn Thiam, R.N. saw Shannon for complaints of asthma.  Exhibit B, p. 7.  Shannon told her that he had been "neglected," wanted to be seen by a doctor, and that he had degenerative joint disease of the hips, back, neck, knees, hands, and fingers.  *See id.*

---

[2] Shannon states that he also filed Sick Call Slip Forms on May 14, May 21, June 1, June 14, June 22, and July 7, 2011.  Dr. Moultrie attests that no Sick Call Request forms for those dates were found in Shannon's medical chart.  ECF 21-2, Exhibit A, n. 1.

On May 17, 2011, P.A. Moss examined Shannon, who stated he wanted his prescriptions refilled.  P.A. Moss renewed the Dilantin and albuterol prescriptions, and scheduled Shannon for evaluation in the Pulmonary and Neurological Chronic Care Clinics ("CCC").  On June 14, 2011, P.A. Moss noted that Shannon did not need a high-calorie diet because his weight had been steady over the last six months.  Exhibit A, ¶ 4; Exhibit B, pp. 3-12, 40-44.

Shannon submitted a Sick Call Request Form dated July 17, 2011, asking to see a doctor to renew his Neurontin prescription.  Exhibit A, ¶ 5; Exhibit B, p. 16.  On July 20, 2011, Dr. Moultrie evaluated Shannon in the CCC.  He noted: 1) "some wheezing," but clear lungs; 2) no spine tenderness; 3) limited range of motion of the hips; and 4) limited extension of the cervical spine due to pain.  Dr. Moultrie renewed Shannon's prescriptions for Neurontin, Dilantin, and albuterol.  He also prescribed Qvar for Shannon's asthma and Tylenol #3 (acetaminophen with codeine) for one month, for pain.  Additionally, Dr. Moultrie requested a pain management consultation for plaintiff.[3]  Shannon was given a wooden cane to help him walk.  Exhibit A, ¶ 5.

On July 25, 2011, a nurse attempted to give Shannon his Tylenol #3.  Because it is a narcotic, the prison requires that the medication must be crushed and dissolved in a cup of water.  Shannon threw the cup with the water and the medication into the trash, claiming he did not want the medicine.  *Id.*

Dr. Moultrie again saw Shannon in the CCC on July 29, 2011.  Dr. Moultrie noted improvement in Shannon's pulmonary function with the addition of the Qvar.  However, Shannon still complained of pain.  Exhibit A, ¶ 5.  Although Shannon indicated that the Neurontin helped his

---

[3] The record does not indicate whether Shannon ever received the pain management consultation.

pain, he stated that it was better when he received it "TID" [i.e., three times daily].  Exhibit B, p. 23, *see also* Exhibit A, ¶ 5.

On August 20, 2011, Shannon told a nurse that he was on a hunger strike.  At that point, Shannon was scheduled to have his vital signs checked twice a week.  The next day, he told another nurse that he had been on a hunger strike for five days, for a reason that "the DOC knows."  Exhibit A, ¶ 6.  On August 22, 2011, plaintiff's "urine showed +3 for ketones."  *Id.*[4]

On August 24, 2011, Shannon told a nurse that he had hoarded and then ingested seventeen (17) amitriptyline tablets to kill himself.  Shannon, who was alert, oriented, and verbally responsive, was transported to the Emergency Department at the Baltimore-Washington Medical Center for evaluation and treatment.  Upon his release from the hospital, Shannon was transferred to the Patuxent Institution for psychiatric care, and thus was no longer under the care of the medical staff at JCI.  Exhibit A, ¶ 7.

During his confinement at JCI, Shannon was also seen by mental health providers.  Exhibit, B. pp. 14, 26-30.  On June 15, 2011, Shannon had an appointment with a mental health care provider, but missed the meeting.  ECF 12-2, State Defendants' Exhibit 1 (records from the Office of Inmate Health Services) p. 8.  On June 29, 2011, Shannon was visited by a mental health care provider after Shannon announced he was on a hunger strike to protest the fact that he was receiving his medical treatment from a physician's assistant rather than from a physician.  *Id.*, p. 10.  Shannon did not express suicidal ideation.  *Id.*  On July 5, 2011, Shannon told a mental health practitioner that he "was no longer on a hunger strike, but he was filing ARPs."  *Id.*, p.12.  The mental health care

---

[4] According to Dr. Moultrie, "Ketones are by-products that result when fatty acids are broken down for energy.  They are used as a source of energy in the heart and brain."  Exhibit A, n. 2.

provider found that Shannon "seemed to be doing fine." *Id.*  Again, no suicidal ideation was reported. *See id.*

On August 3, 2011, Shannon was seen by a psychiatrist for depression. *Id.*, p. 25.  Shannon was described as "pale and undernourished." *Id.*  It was noted that Shannon was on medication for depression and anxiety, and that "his food intake is diminished due to stress and paranoia about his foods.  He does not trust the content of his meal." *Id.*  Shannon did not express any suicidal ideation, however. *See id.* at p. 27.  Shannon was prescribed Risperdal in addition to Elavil.[5]  *See id.* at p. 29.  On August 15, 2012, Shannon had questions about Risperdal and what it did, and spoke briefly with a mental health provider. *See id.* at p. 29.

## III.   STANDARD OF REVIEW

As noted, the defendants moved to dismiss or, in the alternative, for summary judgment. "'The purpose of a Rule 12(b)(6) motion [to dismiss] is to test the sufficiency of a complaint.'" *McBurney v. Cuccinelli,* 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted).  A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts that plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted."  Fed R. Civ. P. 12(b)(6).  Therefore, in considering a motion to dismiss under Rule 12(b)(6), a court must "'accept[] as true the well-pled facts in the complaint and view[] them in the light most favorable to the plaintiff.'" *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (citation omitted).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007).

---

[5] Risperdal (risperidone) is an antipsychotic drug. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000944/.  Elavil is a brand name for

However, Rule 12(d) permits a court, in its discretion, to consider matters outside of the pleadings on a motion under Rule 12(b)(6). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *See Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided in this determination by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

In my view, it is appropriate to consider the parties' extraneous materials, as they are likely to facilitate disposition of this case. Accordingly, I will treat the motions as motions for summary judgment.

Rule 56(a) of the Federal Rules of Civil Procedure ("F. R. Civ. P.") provides:

> A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The

---

amitriptyline. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000666/

court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

F. R. Civ. P. 56(c) states:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

The party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the non-moving party must come forward and demonstrate the existence of a dispute of material fact. *See Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also In re Apex Express Corp.,* 190 F.3d 624, 633 (4th Cir. 1999)*; Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988). What the Supreme Court said in *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original), is instructive:

By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In resolving the motion, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The court generally must view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris,* 550 U.S. 372, 376-77 (2007). There is some limitation to this principle, however; "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Id.* at 380. Nevertheless, because plaintiff is self-represented, his pleadings have been accorded liberal construction. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007).

## IV.   DISCUSSION

The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). The Eighth Amendment to the United States Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state a claim under 42 U.S.C. § 1983, based on a contention of the denial of medical care, in violation of the Eighth Amendment, plaintiff must demonstrate that the actions of defendants (or their failure to act) amounted to deliberate indifference to a serious medical need. *Gamble*, 429 U.S. at 106. When prison officials show "deliberate indifference" to a prisoner's "serious medical needs," their actions or omissions give rise to an Eighth Amendment violation. *Id*. at 104. Deliberate indifference to a serious medical need requires proof that, objectively, plaintiff was suffering from a serious medical

need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As indicated, the medical condition in issue must be serious. *See Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (no expectation that prisoners will be provided with unqualified access to health care). Moreover, a health care provider must have actual knowledge of a serious medical condition, not just knowledge of the symptoms. *See Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998). The plaintiff must also demonstrate knowledge of an excessive risk to inmate health or safety, and "subjective recklessness" in the face of a serious medical condition. *Farmer*, 511 U.S. at 839-40. In other words, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. As the Fourth Circuit said in *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997): "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."

"Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment." *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). Even if the requisite subjective knowledge is established, however, an official may nonetheless avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (focus must be on precautions actually taken in light of

suicide risk, not those that could have been taken) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)).

Notably, prison officials are entitled to rely on medical judgments and expertise of prison physicians and medical personnel concerning the course of treatment deemed necessary for prisoners. *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir.1995); *see Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir.1990) (stating that supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with a prisoner's medical treatment ordered by such personnel).  Mere negligence or malpractice does not rise to a constitutional level.  *See Estelle*, 429 U.S at 105-06.  Rather, the medical treatment provided must be so grossly incompetent, inadequate, or excessive as to shock the conscience, or be intolerable to fundamental fairness.  *See Miltier,* 896 F.2d at 851.

An inmate's disagreement with medical providers about the proper care and course of treatment does not support a § 1983 claim, in the absence of "exceptional circumstances." *Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985); *See Wester  v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).  This is because an inmate does not have a constitutional right to specific medical treatment on demand, simply because he thinks he needs a certain procedure, nor does he have a constitutional right to be treated by a specific doctor, nurse, or other medical personnel.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) ("Society does not expect that prisoners will have unqualified access to health care.").

## 1.    STATE DEFENDANTS

### A.  Warden Wolfe

Shannon does not claim that Warden Wolfe had any personal involvement in his medical

care.  Warden Shannon attests: 1) he has no medical training; 2) prescribing a course of medical or mental health treatment is beyond the scope of his responsibilities; 3) he has no supervisory control over medical  or mental health providers; and 4) he neither interfered with nor delayed the provision of any care to Shannon.  ECF 12-3, Declaration of John Wolfe, Warden of JCI, dated September 21, 2011.

The law is well established that the doctrine of respondeat superior[6] does not apply in § 1983 claims.  *See Monell v. New York Department of Social Services*, 436 U.S. 658, 691 (1978); *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).

"[L]iability under § 1983 is conditioned on a showing of some personal involvement or participation in the denial of civil rights."  *McAdoo v. Toll*, 591 F. Supp. 1399, 1404 (4th Cir. 1984).  "In a § 1983 suit…masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S.Ct. 1937, 1949 (2009); *see Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727–28 (4th Cir. 1999); *Powell v. Shopco Laurel Company,* 678 F.2d 504, 506 (4th Cir. 1982).

In the context of this case, Section 1983 liability on the part of a supervisor requires a showing that:  (1) the supervisory defendant failed promptly to provide an inmate with needed medical care;  (2) the supervisory defendant deliberately interfered with the prison doctors' performance; or (3) the supervisory defendant tacitly authorized or was indifferent to the prison physicians' constitutional violations. *See Miltier*, 896 F. 2d at 854; *see also Slakan v. Porter*, 737

---

[6] The doctrine of vicarious liability is commonly referred to as respondeat superior. Respondeat superior is a legal doctrine by which an employer may be held responsible for the actions of its employees.

F.2d 368, 372 (4th Cir. 1984).

To the extent that Shannon seeks to hold Warden Wolfe culpable under a theory of supervisory liability, his claims are unavailing. Supervisory liability under § 1983 must be supported with evidence that: 1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; 2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and 3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994).

Shannon does not claim Warden Wolfe had actual or constructive knowledge of the incidents in question, nor are there any grounds alleged for assigning supervisory liability. Shannon does not allege that Warden Wolfe was aware of and disregarded an excessive risk to Shannon's health. *See Farmer*, 511 U.S. at 837; *Rich*, 129 F. 3d at 340 n.2. Further, Warden Wolfe was entitled to rely on the opinions of medical professionals concerning Shannon's treatment. For these reasons, Warden Wolfe is entitled to summary judgment in his favor.

### B.  Department of Public Safety and Correctional Services

Shannon makes no specific claim against the DPSCS. Neither the State, nor an arm of the State, is a "person" within the meaning of § 1983. *See Will v. Michigan Department of State Police*, 491 U.S. 58, 64-65 & 70-71 (1989). Moreover, the Eleventh Amendment bars a suit for monetary damages in federal court by a private individual against an unconsenting state or its agencies, absent waiver or congressional abrogation of sovereign immunity pursuant to section five of the Fourteenth Amendment. *See Seminole Tribe v. Florida*, 517 U.S. 44, 56-58 (1996); *Pennhurst State School &*

13

*Hospital v. Halderman*, 465 U.S. 89, 101-02 (1984).  As a state agency, the DPSCS is protected under the Eleventh Amendment from suit for monetary damages, based on sovereign immunity.  For these reasons, the DPSCS is entitled to summary judgment in its favor as a matter of law.[7]

Although Shannon names Greene, Ice, Suggs, Mason, and Ogbolu as party defendants, he makes no claims against them.  Accordingly, they, too, will be dismissed as defendants.

## 2.   MEDICAL DEFENDANTS

### A.  CORIZON

Corizon is a provider of contractual medical services to inmates at certain Maryland correctional institutions. To the extent the complaint names Corizon based solely upon vicarious liability, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior.  *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co*., 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Department of Public Safety and Correctional Services*, 316 Fed. Appx. 279, 282 (4th Cir. 2009).  Accordingly, there is no legal basis to hold Corizon liable in this case and summary judgment will be entered in favor of Corizon.

### B.  Dr. Moultrie and P.A. Moss

Shannon has failed to demonstrate  that Dr. Moultrie or P.A. Moss consciously disregarded a

---

[7] Shannon has filed a "Motion in the Form of a Settlement" (ECF No. 24) in which he offers to withdraw this case if he can serve the remainder of his sentenced at Patuxent Institution. Administrative decisions to change an inmate's location or classification rest in the discretion of prison officials, based on the needs of managing the prison, and such changes do not give rise to due process protections.  *See Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991).  Prisoners do not have a constitutionally recognized liberty interest in a particular security classification, nor a constitutional right to be confined in a particular prison. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *Meachum v. Fano*, 427 U.S. 215, 224 (1976).

substantial risk of serious harm to him, or that the treatment provided to him was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851.   To the contrary, Shannon's uncontroverted medical records show that he was examined, his health was monitored, and he was prescribed medications for his conditions.  Shannon did not have a right to demand treatment from a specific medical provider. *See Hudson*, 503 U.S. at 9.  Moreover, he provided no evidence that these defendants were deliberately indifferent to his serious medical needs.   To the contrary, Shannon's own conduct, including hoarding pills, staging a hunger strike, and refusing to take prescribed medication, contributed to his medical problems.

## V.  CONCLUSION

For these reasons, the Court finds that summary judgment in favor of the State and medical defendants is appropriate. The State defendants' motion for summary judgment and the medical defendants' motion for summary judgment shall both be granted by separate order.


April 5, 2012                          /s/_____
 Date                                 Ellen Lipton Hollander
                                      United States District Judge